129 F.3d 838
 45 ERC 1673, 28 Envtl. L. Rep. 20,247
 Richard M. DONAHEY; Patricia A. Donahey,
Plaintiffs-Appellants/Cross-Appellees,
v.
Helen L. BOGLE, Defendant-Appellee/Cross-Appellant,
Seabourn S. Livingstone; H. Gordon Wood; St. Clair Rubber
Company, Defendants-Appellees.
 Nos. 92-1128, 92-1151.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 6, 1995.
Decided Nov. 17, 1997.
 
 H.G. Sparrow, III (argued and briefed), Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, MI, for Plaintiffs-Appellants/Cross-Appellees.
 Mark A. Goldsmith (argued and briefed), Jay E. Brant, Daniel G. Helton (briefed), Honigman, Miller, Schwartz & Cohn, Detroit, MI, for Defendant-Appellee/Cross-Appellant Helen L. Bogle.
 Henry N. Carnaby (argued and briefed), Bodman, Longley & Dahling, Troy, MI, Louise A. Marcotty (briefed), Bodman, Long & Dahling, Detroit, MI, for Defendant-Appellee Seabourn S. Livingstone.
 Robert G. Kamenec, Plunkett & Cooney, Detroit, MI, for Defendant-Appellee St. Clair Rubber Company.
 M. Alice Thurston (briefed), U.S. Department of Justice, Land & Natural Resources Division, Washington, DC, Anne S. Almy (briefed), U.S. Department of Justice, Washington, DC, for Amicus Curiae.
 Before: MARTIN, Chief Judge; MERRITT, KENNEDY, MILBURN, NELSON, RYAN, BOGGS, NORRIS, SILER, BATCHELDER, DAUGHTREY, and MOORE, Circuit Judges.
 ALAN E. NORRIS, J., delivered the opinion of the court, in which MERRITT, KENNEDY, MILBURN, DAVID A. NELSON, BOGGS, SILER, and BATCHELDER, JJ., joined. RYAN, J. (p. 844), delivered a separate concurring opinion, in which MOORE, J., joined. BOYCE F. MARTIN, Jr., C.J. (pp. 844-46), delivered a separate dissenting opinion, in which DAUGHTREY, J., joined.OPINION
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 Like so many actions brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9675 (1988 & Supp. V 1993), this case illustrates the difficulties that often attend the apportionment of financial liability for the environmental damage done to an industrial site. Sitting en banc, this court recently held that, under CERCLA, a parent corporation is liable for the environmental harms done by its subsidiary only if the elements necessary to pierce the corporate veil are present. United States v. Cordova Chem. Co. of Michigan, 113 F.3d 572, 579-80 (6th Cir.1997). For the reasons outlined below, we conclude that the same standard applies to a 100% shareholder of a corporation.
 
 I.
 
 2
 This case involves an industrial site located in Marysville, Michigan. On October 31, 1962, defendant Helen L. Bogle acquired title to the property. That same day she entered into a ten-year lease with the St. Clair Rubber Company, also a named defendant. At its expiration, the lease was renewed for a second ten-year term.
 
 
 3
 In its post-trial Memorandum Opinion and Order filed October 1, 1991, the district court made extensive findings of fact, including the following description of the use to which St. Clair put the property in question:
 
 
 4
 St. Clair's manufacturing processes utilized various organic compounds, including aromatic compounds such as, but not limited to, methyl-ethyl-ketone ("MEK"), benzene, xylene, hexane, toluene and various other compounds such as resins and rubber raw materials.
 
 
 5
 ....
 
 
 6
 One of St. Clair's manufacturing processes involved the blending of resins, solvents ... and other raw materials to produce various rubber products and adhesives....
 
 
 7
 The blending process left a waste product on the churns that St. Clair removed by treating the churns with additional solvent. The waste product combined with the additional solvent, and the resulting "sludge" was drained off into 55 gallon drums....
 
 
 8
 ....
 
 
 9
 Typically, St. Clair employees transported 12 to 20 barrels or drums of sludge from the adhesive plant to the property every six month[s] for disposal. The employees allowed the sludge to drain from the barrels for approximately one week, after which they returned to burn the sludge. At the behest of the City of Marysville, St. Clair stopped its dumping and burning at the property in the 1970s.
 
 
 10
 Mem. Op. at 4-5. In short, the district court concluded that this and other manufacturing activities conducted by St. Clair resulted in significant environmental harm to the property.
 
 
 11
 Throughout the time period relevant to this case, Bogle's brother, defendant Seabourn S. Livingstone, owned 100% of St. Clair's stock. He also served as chairman of the board of directors and as treasurer. With respect to his direct involvement in the pollution caused by St. Clair, however, the district court made the following factual finding:
 
 
 12
 [T]here is no credible evidence that Livingstone personally participated in the waste disposal practices of St. Clair. No witness testified that Livingstone gave explicit or implicit instructions to dispose of wastes in a specific manner. The testimony at trial clearly indicated that Livingstone personally participated in only the financial aspects of St. Clair's operations, and that the day to day affairs, including waste disposal practices, were handled by managers and supervisors who did not need approval from Livingstone to execute their duties. While it is true that Livingstone had the authority to control waste disposal practices, he never exercised such authority; it was delegated to others....
 
 
 13
 There is also no evidence that Livingstone personally arranged for the disposal of St. Clair's industrial waste products.
 
 
 14
 Mem. Op. at 28-29 (footnote omitted).
 
 
 15
 In the fall of 1981, plaintiff Richard Donahey considered purchasing the property because it was situated near the manufacturing facility of Daca Manufacturing, Incorporated, a company in which he had an interest. Donahey inspected the property and, based upon his own experience in manufacturing, recognized that it contained a dump. Before entering into a land contract with Bogle, therefore, Donahey first negotiated an agreement with St. Clair in which the former tenant consented to restore the property to an environmentally satisfactory condition. St. Clair also agree to indemnify Donahey for costs resulting from any dumping on the part of the company.[1]
 
 
 16
 On January 6, 1982, Donahey purchased the property from Bogle for $115,000, putting $28,750 down and agreeing to pay the remainder in monthly installments at 11% interest. Donahey deeded the property to himself and to his wife, plaintiff Patricia Donahey, on January 28. They then leased the site to Daca Manufacturing.
 
 
 17
 Not long after acquiring the property, Donahey had reason to question his purchase. First, former St. Clair employees detailed the extent of the company's disposal practices to the Michigan Department of Natural Resources ("MDNR"). Then, in 1985, a newspaper article described the pollution of the property.[2] Finally, on April 28, 1986, the MDNR informed the Donaheys that they were required, as its owners, to undertake an environmental evaluation of the property.
 
 
 18
 Richard Donahey responded to these developments by hiring Lawrence Halfen, an environmental consultant, to devise a remediation plan. Halfen proposed and carried out a plan at a cost of between $30,000 and $35,000. While overseeing the clean-up, however, Halfen noticed additional problems in the form of a "swath of gelatinous material." When the ground began to sink under the weight of a backhoe, further investigation revealed buried pits ranging from six to ten feet in depth. He undertook additional efforts at remediation in light of this discovery. However, this initial effort was a temporary solution at best. Consequently, Halfen proposed a second plan in late 1987 with an estimated price-tag of $450,000.[3]
 
 
 19
 Given the fact that release of solvents into the soil occurred before his ownership,[4] Donahey understandably sought a contribution for the clean-up from the previous owner, Bogle. To that end, he notified her on August 2, 1987, that future payments on the land contract would be placed in escrow. For her part, Bogle informed plaintiffs that she was accelerating the payments due under the land contract.
 
 
 20
 In a clear demonstration of how the value of the property had plummeted as the extent of the environmental damage became clear, plaintiffs attempted to surrender their interest in the property in August of 1990 by tendering quitclaim deeds to Bogle, an overture that she refused. Shortly thereafter, Richard Donahey ceased making payments on the land contract all together and effectively abandoned the property.
 
 
 21
 The Donaheys filed an eleven-count complaint on November 6, 1987, which included a CERCLA claim and also sought to rescind the land contract. Bogle responded by filing a counterclaim, as well as a cross-claim against St. Clair and her brother, Seabourn Livingstone. The district court conducted a bench trial in 1991, and issued the Memorandum Opinion and Order cited above on October 1, 1991.
 
 
 22
 Among other things, the district court held that 1) none of the parties had incurred any recoverable response costs under CERCLA; 2) Richard Donahey is the current owner of the property; 3) Richard Donahey is obliged to perform specifically the land contract within ten days of judgment, including pre-- and post-judgment interest; and, 4) Seabourn Livingstone was not a responsible party as defined by CERCLA because he took no active role in St. Clair's environmental activities.
 
 
 23
 On appeal, this court affirmed in part and reversed in part. Donahey v. Bogle, 987 F.2d 1250 (6th Cir.1993). We agreed that Bogle could demand specific performance despite plaintiffs' argument that they were entitled to rescind the land contract because the environmental contamination constituted an encumbrance that prevented transfer of clear title to the property. Id. at 1254.
 
 
 24
 With respect to the CERCLA issues, however, we reasoned that, "the [trial] court erred in concluding that Seabourn Livingstone was not liable as an owner under CERCLA. The evidence clearly established that Livingstone had the authority to prevent the contamination of the property by his corporation; thus, as a matter of law, Livingstone was a responsible party."[5] Id.
 
 
 25
 Finally, this court granted plaintiffs' request for attorney's fees and response costs and remanded the matter to the district court for determination of the appropriate amount due plaintiffs. Id. at 1255-56.
 
 
 26
 The Supreme Court subsequently granted certiorari in light of Key Tronic Corp. v. United States, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), a case holding that attorney's fees were generally not recoverable as response costs under CERCLA. The Court vacated our earlier judgment and remanded the case for further consideration of the attorney's fees issue. Livingstone v. Donahey, 512 U.S. 1201, 114 S.Ct. 2668, 129 L.Ed.2d 805 (1994).
 
 II.
 
 27
 Before the trial court, plaintiffs sought an award of $279,000 for attorney's fees incurred as necessary expenses in their attempt to clean up the property. Reversing the trial court, this court adopted the reasoning of Bolin v. Cessna Aircraft Co., 759 F.Supp. 692 (D.Kan.1991), for the proposition that attorney's fees were recoverable by private parties under § 107 of CERCLA. Donahey v. Bogle, 987 F.2d at 1256.
 
 
 28
 In Key Tronic, the Supreme Court explicitly considered whether attorney's fees are "necessary costs of response" within the meaning of § 107(a)(4)(B) of CERCLA, which would make them recoverable. Key Tronic, 511 U.S. at 811, 114 S.Ct. at 1963. The Court concluded that "CERCLA § 107 does not provide for the award of private litigants' attorney's fees associated with bringing a cost recovery action." Id. at 819, 114 S.Ct. at 1967. However, the Court did not absolutely rule out recovery of some fees paid to attorneys:
 
 
 29
 The conclusion we reach with respect to litigation-related fees does not signify that all payments that happen to be made to a lawyer are unrecoverable expenses under CERCLA. On the contrary, some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of § 107(a)(4)(B). The component of Key Tronic's claim that covers the work performed in identifying other potentially responsible parties falls in this category....
 
 
 30
 ....
 
 
 31
 This reasoning does not extend, however, to the legal services performed in connection with the negotiations between Key Tronic and the EPA that culminated in the consent decree. Studies that Key Tronic's counsel prepared or supervised during those negotiations may indeed have aided the EPA and may also have affected the ultimate scope and form of the cleanup. We nevertheless view such work as primarily protecting Key Tronic's interests as a defendant in the proceedings that established the extent of its liability. As such, these services do not constitute "necessary costs of response" and are not recoverable under CERCLA.
 
 
 32
 Id. at 819-21, 114 S.Ct. at 1967-68 (footnote omitted).
 
 
 33
 Plaintiffs concede that litigation-related attorney's fees are not recoverable in light of Key Tronic, but contend that the fees generated by their attorneys in attempting to identify the insurers of St. Clair Rubber qualify under the "investigative" exception cited above.
 
 
 34
 We disagree. In our view, Key Tronic contemplates a narrow exception to the general rule prohibiting the recovery of attorney's fees. That exception is limited to steps taken to finger previously unidentified parties that might bear some legal responsibility under the terms of CERCLA for pollution of the site. In this case, St. Clair had already been identified; indeed, it was a named defendant. Its insurers, although perhaps contractually liable for some of the costs related to the clean-up, are not potentially responsible parties under § 107(a) of CERCLA and thus any attorney's fees related to their identification fall outside the exception and are not recoverable.[6]
 
 
 35
 Accordingly, we affirm the district court's denial of attorney's fees.
 
 III.
 
 36
 In Cordova, this court held that "where a parent corporation is sought to be held liable as an operator pursuant to 42 U.S.C. § 9607(a)(2) based upon the extent of its control of its subsidiary which owns the facility, the parent will be liable only when the requirements necessary to pierce the corporate veil are met." Cordova, 113 F.3d at 580. In determining the requisite standard for piercing the veil, federal courts must look to state law. Id. Since both Donahey and Cordova arose in Michigan, this court's reading of the Michigan doctrine of veil piercing applies to the case before us:
 
 
 37
 Michigan appears to follow the general rule that requires demonstration of patent abuse of the corporate form in order to pierce the corporate veil. There must be such a unity of interest and ownership that the separate personalities of the corporation and its owner cease to exist, and the circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. Organization of a corporation for the avowed purpose of avoiding personal responsibility does not in itself constitute fraud or reprehensible conduct justifying a disregard of the corporate form.
 
 
 38
 Cordova at 580 (citations and footnote omitted).
 
 
 39
 Michigan courts recognize that stockholders, like parent corporations, are shielded from liability unless the requirements necessary to pierce the corporate veil are satisfied: "The corporate form is valid and will be protected by courts even when there is a single stockholder who is entitled to dominate the company and receive all of its profits." Allstate Ins. Co. v. Citizens Ins. Co. of America, 118 Mich.App. 594, 600, 325 N.W.2d 505, 508 (1982) (citing Gottlieb v. Arrow Door Co., 364 Mich. 450, 110 N.W.2d 767 (1961)). Given the similar treatment accorded parent corporations and stockholders with respect to vicarious liability, it is clear to us that the standard articulated in Cordova before operator liability can attach should be extended to stockholders of a corporation. We therefore hold that a stockholder is not liable as an operator as defined by § 107(a)(2) of CERCLA unless circumstances justify piercing the corporate veil.[7] Because there are no facts present that would justify such veil-piercing in this case, Livingstone is not liable as an operator for the clean-up of the property in question.
 
 
 40
 Accordingly, the decision of the district court holding that Seabourn Livingstone is not liable under § 107(a)(2) of CERCLA is affirmed.
 
 IV.
 
 41
 Finally, Donahey asks us to revisit certain issues decided by the original panel in addition to those already discussed. While our "law of the case" doctrine does not require an en banc court to adhere to the decision of a prior panel, see 6th Cir. Rule 14(a) ("[T]he effect of the granting of a rehearing en banc shall be to vacate the previous opinion and judgment of this court"), we believe that the reasoning of the prior panel was correct on all issues not otherwise discussed in this opinion. Accordingly, we reinstate and reaffirm Donahey v. Bogle, 987 F.2d 1250 (6th Cir.1993), except as to attorney's fees and § 107(a)(2) operator liability.
 
 V.
 
 42
 This action is remanded to the district court for proceedings consistent with this opinion.
 
 
 43
 RYAN, Circuit Judge, concurring.
 
 
 44
 I concur in the majority opinion solely because I think I am obligated to do so by reason of the precedentially binding decision of this court in United States v. Cordova Chemical Co., 113 F.3d 572 (6th Cir.1997) (en banc ). As I explained in my dissenting opinion in that case, I think the court was seriously and obviously mistaken in its conclusion that a parent corporation could not be held directly liable as an "operator" under 42 U.S.C. § 9607(a)(2), but only derivatively so, and then only if, under applicable state law, its corporate veil could be pierced.
 
 
 45
 Now, the court extends that rather obvious misreading of CERCLA to protect a 100% shareholder of an ostensible operator corporation from direct section 107(1)(2) liability no matter what the evidence shows as to his activities. The principle of law governing the two cases is indistinguishable, and therefore I am constrained to concur in the judgment.
 
 
 46
 BOYCE F. MARTIN, JR., Chief Judge, dissenting.
 
 
 47
 According to the en banc majority opinion, the sole shareholder of a corporation will escape liability under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601-9675, for environmental damage unless there are grounds for piercing the corporate veil. The majority has extended United States v. Cordova Chem. Co. of Michigan, 113 F.3d 572 (6th Cir.1997), petition for cert. filed, 66 U.S.L.W. 3157 (U.S. Aug. 8, 1997) (No. 97-296), an opinion on corporate veil piercing and CERCLA, to protect shareholders from environmental liability in all but the most extreme cases. I dissented in Cordova, and I write again to register my continuing unhappiness that the majority has turned a blind eye to congressional intent. The en banc majority merely compounds the error of Cordova and pushes responsibility for environmental liability onto the wrong parties. The majority opinion not only creates new law but also offers novel opportunities for the savvy polluter. Therefore I dissent on this issue.
 
 
 48
 The majority opinion relieves defendant Seabourn Livingstone of CERCLA responsibility, but the larger problem is the blueprint it provides for future environmental malfeasors. Facility owners and operators are liable for pollution under 42 U.S.C. § 9607(a)(1) and (2), but the ruling of the en banc majority provides the savvy polluter with a way to avoid that liability. The savvy polluter can form a closely held corporation of which he holds 100 percent of the shares. He can play an active role in the company but follow a "don't ask, don't tell" policy regarding the disposal of environmental toxins. This savvy polluter, although he manages the company and owns all the shares, nonetheless will not be considered an "owner" or "operator" under the majority's reading of CERCLA. The only way to reach the savvy polluter is to pierce the corporate veil and hold him derivatively liable. Of course, the hypothetical polluter posited herein is savvy enough to realize that in some states it is easier to pierce the veil than it is in others. He therefore will incorporate where he has the greatest protection. In Michigan, for instance, the savvy polluter will be protected from veil piercing unless it can be shown that he engaged in fraud--a difficult evidentiary standard to meet. Cordova, 113 F.3d at 580. In this way, the en banc majority opinion short-circuits CERCLA.
 
 
 49
 The majority gives the savvy polluter an opportunity to play state law off against federal law. A corporation is a product of state law. As such it should not provide a shield behind which an individual can flaunt federal law. "[T]he Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies." First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 630, 103 S.Ct. 2591, 2601, 77 L.Ed.2d 46 (1983). One of the legislative policies behind CERCLA is to make "those responsible for disposal of chemical poisons bear the cost and responsibility for remedying the harmful conditions they created." Anspec Co. v. Johnson Controls, Inc., 922 F.2d 1240, 1247 (6th Cir.1991) The en banc majority allows Livingstone to misuse a state creation, a corporation, to circumvent a federal policy.
 
 
 50
 Federal-state issues aside, this case is not about imposing liability on the average shareholder. In discussing "shareholder" liability in this context, I limit my comments specifically to sole shareholders who are active in the corporation. I reserve the question of the liability of people who own less than 100 percent of a corporation's shares or who are not active in management. I do so because CERCLA specifically excludes shareholders who are not involved in the management of companies from the definition of "owners" and "operators." 42 U.S.C. § 9601(20)(A)(iii). The explicit exclusion of one class of shareholders from the class of owners or operators "implies that an owning stockholder who manages the corporation ... is liable under CERCLA as an 'owner or operator.' " New York v. Shore Realty Corp., 759 F.2d 1032, 1052 (2d Cir.1985). Some degree of control of the corporation is necessary.
 
 
 51
 Livingstone does not fall into the class of shareholders excluded by 42 U.S.C. § 9601(20)(A)(iii) because he exercised the requisite control. Livingstone owned 100 percent of the St. Clair Rubber Company's stock. By definition, anyone who owns all the stock has plenary power to run a company, but Livingstone's formal role in the company is also well recorded. Livingstone was active in managing the financial aspects of the business. He was the treasurer and chairman of the board. The district court found that although "Livingstone had the authority to control waste disposal practices, he never exercised such authority." Mem. Op. at 28-29. Simply ignoring environmental misdeeds, however, should not be a way of avoiding CERCLA liability. United States v. TIC Inv. Corp., 68 F.3d 1082, 1089 (8th Cir.1995), cert. denied, --- U.S. ----, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) (noting, in context of arranger liability, that it would violate the goals of CERCLA if "[a] corporate officer, who has virtually unlimited control over a company and in fact exercises that control but knows well enough to close his or her eyes to the specific details of the company's hazardous waste disposal practices, could avoid CERCLA liability"). The district court found that the St. Clair Rubber Company's activities caused environmental harm, but the buck did not stop with St. Clair because the company was dissolved in the early 1980s. Mem. Op. at 9. Nor did the buck stop with Livingstone.
 
 
 52
 Livingstone, however, should bear responsibility as a "covered person" under 42 U.S.C. § 9607. In light of his role as owner and manager, Livingstone is an "operator" under CERCLA. TIC Inv. Corp., 68 F.3d at 1089 (holding that arranger liability, which is analogous to operator liability, for corporate officers is premised on having authority to control that is exercised directly or indirectly); United States v. Northeastern Pharm. & Chem. Co., 810 F.2d 726, 743 (8th Cir.1986); Shore Realty, 759 F.2d at 1052. Because he had the ability to control waste disposal, it need not be shown that Livingstone actually was involved in the disposal. A good analysis is found in Kelley v. Thomas Solvent Co., 727 F.Supp. 1532, 1544 (W.D.Mich.1989): "[T]he focus on the inquiry is whether the corporate individual could have prevented the hazardous waste discharge at issue." We should adopt a similar view. Livingstone could have stopped the pollution. He did not.
 
 
 53
 Given that Livingstone can be considered an "operator" of the company in the parlance of CERCLA, the en banc majority is speaking in the wrong idiom when it talks of piercing the corporate veil in order to hold him derivatively liable. Under derivative liability, a shareholder would be held responsible for the environmental sins of his corporation if the corporate veil could be pierced. There is no reason to discuss piercing the corporate veil when a 100 percent shareholder can be held directly liable as an operator under 42 U.S.C. § 9607(a)(2). As the district court stated in an unreviewed opinion in Kelley: "I believe that CERCLA's statutory scheme varies the configuration of traditional corporate principles which prevent individual liability absent a conclusion that an individual engaged in procedural irregularities justifying a court in 'piercing the corporate veil'...." 727 F.Supp. at 1542.
 
 
 54
 I am not advocating the total disregard of limited liability for shareholders. Limited liability is too important to capital formation to be readily dismissed. My dissent covers a far more restricted class of persons than the average shareholder. A holder of one share of stock in a Fortune 500 company need not fear personal liability for the company's potential environmental liabilities. When, however, a person owns all the shares in a corporation and plays a management role, that person should be considered an operator under 42 U.S.C. § 9607(a)(2) and subjected to the corresponding liability under CERCLA. I therefore respectfully dissent from the majority opinion.
 
 
 
 [1]
 The value of this agreement was of limited duration. As the district court found, "St. Clair's Michigan Annual Reports for Profit Corporations for the period spanning 1979-1983 repeatedly and consistently indicate that its term of existence was to expire on March 18, 1983. In the early 1980s, St. Clair Rubber dissolved and ceased to exist as a corporation." Mem. Op. at 7-8
 
 
 [2]
 Although all environmental degradation is arguably a matter of public concern, the pollution present at this particular property was of particular interest because of its proximity to the local water supply
 
 
 [3]
 The current cost of such a plan is approximately $1,000,000
 
 
 [4]
 The district court made an explicit finding on this point. Mem. Op. at 9
 
 
 [5]
 Although the opinion refers to Livingstone's liability as an owner, it is clear from the discussion that liability was premised upon his status as an "operator." 42 U.S.C. § 9607(a)(2)
 
 
 [6]
 We note in passing that plaintiffs seek reimbursement of attorney's fees incurred in deposing Seabourn Livingstone. Yet that is precisely the type of task that can only be performed by an attorney, one of the considerations listed by Key Tronic that would support a denial of fees
 Furthermore, like the environmental studies disallowed in Key Tronic, the identification of St. Clair's insurers primarily protected plaintiffs' interests since they sought monetary compensation from the company.
 
 
 [7]
 Although Cordova also provided for § 107(a)(2) liability for parent corporations that directly operate the facility, 113 F.3d at 579, that scenario is not before us with respect to Livingstone