166 F.3d 840
 29 Envtl. L. Rep. 20,506
 CARTER-JONES LUMBER COMPANY, Plaintiff-Appellee/Cross-Appellant,
v.
DIXIE DISTRIBUTING COMPANY and Harry C. Denune,
Defendants-Appellants/Cross-Appellees,
LTV Steel Company, et al., Defendants.
 Nos. 97-3422, 97-3709.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 30, 1998.
Decided Feb. 2, 1999.
 
 John A. Daily (argued and briefed), Richard T. Schnars (briefed), Daily & Schnars, Uniontown, OH, for Plaintiff-Appellee/Cross-Appellant.
 Michael T. Gmoser (argued and briefed), Michael T. Gmoser Co., L.P.A., Hamilton, OH, Terence L. Gallagher and Keith Anthony Kavinsky (briefed), Gallagher & Kavinsky, Columbus, OH, for Defendant-Appellant/Cross-Appellee.
 Before: BOGGS, SUHRHEINRICH, and SILER, Circuit Judges.
 OPINION
 SILER, Circuit Judge.
 
 
 1
 The district court found defendants, Dixie Distributing and Harry C. Denune, Dixie's 100% shareholder, severally liable under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9601 et seq., as arrangers for the disposal of hazardous waste. That waste had contaminated land owned by plaintiff, Carter-Jones Lumber Co., which filed this CERCLA action against Dixie, Denune and other defendants, not parties to this appeal, to recover costs expended in cleanup of the site. Dixie and Denune appealed the judgment. Carter-Jones cross-appealed the decision of the court denying joint and several liability by Dixie and Denure. We AFFIRM in part and REVERSE in part.
 
 I. BACKGROUND:
 
 2
 Carter-Jones initiated this private cost-recovery action against Dixie (an Ohio corporation) and Denune pursuant to § 113 of CERCLA, which governs contribution actions. Carter-Jones sought reimbursement for costs it incurred in removing environmentally hazardous substances from a site in central Ohio.
 
 
 3
 After trial, the district court found Dixie to be liable for 50% of the response costs, with Denune liable for 30% of the response costs, recoverable by Carter-Jones as a claim for contribution under 42 U.S.C. § 9613(f). The district court initially found them to be jointly and severally liable, but upon petition for reconsideration, it amended its order to make them severally liable only.
 
 
 4
 In October 1985, Dixie and Denune purchased from Federal Paper Board Company ten transformers containing polychlorinated biphenyls ("PCBs") and six regulators for a total price of $1,000.00. Denune signed an affidavit at the time of sale acknowledging the problem with PCB disposal and apparently negotiated the purchase of the transformers. At the time of purchase, Dixie obtained a report from Federal Paper of a recent inspection of the transformers which indicated that they were not leaking. The transformers were later moved to real estate owned by Denune. Three were sold to an individual named Abe Hoosharnejad in Columbus and were later destroyed by fire, according to the testimony of Denune, while the remaining seven transformers were moved to a building in Springfield, Ohio in the spring of 1986.
 
 
 5
 In June 1987, Dixie sold the seven transformers to Top Dollar Liquidators for $700.00. James Henderson signed (or seems to have signed, although there is conflicting evidence on this point) an affidavit on behalf of Top Dollar acknowledging the problem of PCB disposal. Only four of those transformers were moved by Top Dollar to a facility in Columbus. They were moved without a permit in an overweight truck illegally at night so as to be undetected by the authorities. Woody Underwood, affiliated with Top Dollar, was present when the transformers were sold to Top Dollar and stated that Henderson and Denune were entering into an arrangement to hide the transformers from the Ohio Environmental Protection Agency ("OEPA").
 
 
 6
 In September 1987, Denune sold to Tracy Westfall three of the seven transformers which he had already sold to Top Dollar and James Henderson. Denune alleges that Westfall signed an affidavit acknowledging the problem of PCB disposal, but Westfall denied even signing the affidavit. Both Henderson and Westfall were in the salvage liquidation business. According to Henderson, the trailer containing Top Dollar's four transformers remained locked and stationary at the Hendron Road property, the property involved in the cleanup here, for approximately one year.
 
 
 7
 In July 1988, Stephen Rumich notified the OEPA in a citizen complaint that transformers were being destroyed, or "scrapped," according to employees at the Hendron Road property, and that oil was leaking onto the ground. The next day, Tom Buchan of the OEPA inspected the site and discovered that four PCB-containing transformers were on the premises in a trailer. Their serial numbers were intact. He discovered that two of the four showed evidence of leakage, although there was no active flow, and that there was extensive leakage of oil on the ground. One transformer was damaged by something other than deterioration, and Henderson told Buchan that the spill was caused by an employee who opened a valve on a transformer. Buchan also testified that additional drums contaminated with PCBs were on the trailer.
 
 
 8
 Buchan traced the four transformers to Federal Paper, which informed him that, in 1985, it sold ten transformers to Denune and Dixie. Then, in October 1988, Buchan inspected Dixie's Columbus facility and arranged to inspect the Springfield facility in November. Two hours before the inspection at Springfield in 1988, a truck left that property and drove to a location in Butler County known as Canal Auto. The truck was found to contain five PCB transformers with the tops removed, as well as other contaminated items such as paint solvents and PCB-laden capacitors. Denune had previously told Buchan that he only had two PCB transformers. A cleanup then began at the Canal Auto site and was paid for by Dixie and Denune.
 
 
 9
 After that cleanup, the OEPA attempted to have the Hendron Road site cleaned through contacts with Henderson, Michael Walcutt, and Dean Walcutt, who had negotiated an option to purchase the property from Carter-Jones. A contingency to the purchase was Walcutt's cleanup of the property. In May 1989, Dean Walcutt decided not to exercise the option on the property, but he did not notify Carter-Jones. While the transformers were at the Hendron Road property, Denune personally checked on them on at least two occasions. Also in May 1989, the trailer containing the four transformers was taken from the Hendron Road property on a day when both Henderson and Westfall were on the premises. The four transformers were later found on property in Columbus which was owned by Denune and leased by Westfall. Westfall testified that Denune arranged for the delivery of the transformers to that property. When the transformers were found in Columbus, the identifying serial numbers had been removed and they were in various stages of destruction. That same month the OEPA arrived at the Columbus site, and Defendant Denune was ordered to clean up the site.
 
 
 10
 In July 1990, Carter-Jones entered into a Consent Order to clean up at the Hendron Road property, and it ultimately incurred cleanup costs of over $3 million.
 
 
 11
 At all times relevant to the liability issues in this case, Denune was president, chief executive officer, and the only shareholder of Dixie. He ceased to be president and CEO in 1989, but remains the sole owner of Dixie. He denies that he was involved in Dixie's illegal disposal practices, arguing that he was but one of twenty-one employees of Dixie. He has not, however, presented any evidence to show that any other Dixie employee had responsibility for waste disposal practices. Denune is the representative of Dixie who purchased and sold the transformers and who signed the affidavit relating to PCB hazards on Dixie's behalf at the time the transformers were first purchased.
 
 II. DISCUSSION:
 
 12
 A. Arranging for the disposal of hazardous substances.
 
 
 13
 Under CERCLA, any person who has "otherwise arranged for disposal" of hazardous substances is liable for response costs. 42 U.S.C. § 9607(a)(3). The requisite inquiry for those who may have "otherwise arranged" is "whether the party intended to enter into a transaction that included an 'arrangement for' disposal of hazardous substances. The intent need not be proven by direct evidence, but can be inferred from the totality of the circumstances." United States v. Cello-Foil Prods., Inc., 100 F.3d 1227, 1231 (6th Cir.1996).
 
 
 14
 "Frequently, the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds." Whether a party possesses the requisite intent is a question of fact.
 
 
 15
 Id. at 1233 (citations omitted) (quoting Washington v. Davis, 426 U.S. 229, 253, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (Stevens, J., concurring)). This court therefore reviews a district court's determination that a party "otherwise arranged for disposal" for clear error. It is true that the Sixth Circuit has apparently applied de novo review to a case such as this, in United States v. Cordova Chemical Co. of Michigan, 113 F.3d 572 (6th Cir.1997), but as that case was vacated after review by the Supreme Court, United States v. Bestfoods, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), we will follow the plain statement of Cello-Foil that intent is a question of fact.
 
 
 16
 The facts of this case are complex and the evidence is somewhat unclear. The district court's determination that defendants intended to arrange for disposal is not clearly erroneous, as evidence in the record supports that determination. The result of the many transactions was that the transformers were indeed being scrapped rather than reused. Arguably shady practices were used by defendants and those with whom they dealt. The district court's inference that defendants intended the arrangement for disposal cannot be overturned on the evidence in this case under a clearly erroneous standard.
 
 
 17
 B. Third party defense.
 
 
 18
 The third party defense under CERCLA requires proof that the acts or omissions of a third party be the sole cause of a release. 42 U.S.C. § 9607(b)(3). This third party may not be one whose act or omission is contractually connected with the defendant, either directly or indirectly. Id. Because the district court's factual determination that defendants "otherwise arranged for disposal" is not clearly erroneous, the third party defense is not appropriate.
 
 
 19
 Reviewed either for clear error or de novo, the district court's determination that the third party defense is inapplicable here is correct. Because the third party alleged to have been the sole cause of the release was the employee of Henderson, the person with whom Dixie was said to have arranged for disposal, the third party defense is unavailable. It may indeed be true that the acts of Henderson's employee were intentional and criminal, but the acts and the consequences were not unforeseeable, as required by the statutory defense, see 42 U.S.C. § 9607(b)(3).
 
 
 20
 C. Constitutionality of cost apportionment under 42 U.S.C. § 9613.
 
 
 21
 This question of constitutional law will be reviewed de novo by this court. Defendants argue that this system of cost apportionment, wherein a "court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate," 42 U.S.C. § 9613(f), affects an interest protected by the due process clause, the right not to have property taken without due process of law. Defendants argue that their right to due process is violated by § 9613(f) because it provides no definite standard by which a court is to make its determinations.
 
 
 22
 Federal courts are courts in law and in equity, and a court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case. United States v. Price, 688 F.2d 204, 211 (3d Cir.1982).
 
 
 23
 The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs....
 
 
 24
 Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944). The system of cost apportionment under 42 U.S.C. § 9613 is not unconstitutionally vague.
 
 
 25
 D. Denune's personal liability under 42 U.S.C. § 9607(a)(3).
 
 
 26
 If the district court placed liability on Denune because it found that he personally participated in the arrangements for disposal, that conclusion would be subject to review for clear error, as discussed previously. If the court placed liability on Denune because of his position as president, CEO, and sole shareholder, that conclusion would be a conclusion of law subject to de novo review. Although the district court discusses Denune's active role in the transactions related to the PCB transformers, it also appears to have relied upon Denune's position in Dixie. De novo review is therefore the most appropriate standard.
 
 
 27
 Under either standard of review, it is imperative that this court consider the district court's decision in light of United States v. Bestfoods, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), a decision which vacated this court's decision in United States v. Cordova, 113 F.3d 572 (6th Cir.1997), and which also caused the Supreme Court to vacate the decision in Donahey v. Bogle, 129 F.3d 838 (6th Cir.1997), vacated, --- U.S. ----, 118 S.Ct. 2317, 141 L.Ed.2d 692 (1998). In Bestfoods, the Supreme Court answered the question of whether a parent corporation that participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary. The Court said no, unless the corporate veil is pierced. Bestfoods, 118 S.Ct. at 1881. However, it added that a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility. Id.
 
 
 28
 Bestfoods, a case involving § 9607(a)(2), operator liability, must logically be applied to cases involving § 9607(a)(3), arranger liability: Both operators and arrangers are potentially responsible parties ("PRPs"). Here, using Bestfoods, Denune can be liable as an arranger for disposal due to his status as the sole shareholder of Dixie if Ohio law would allow the piercing of the corporate veil, and he can also be liable in his own right due to his intimate participation in the arrangement for disposal. He may not hide behind his officer or employee status in Dixie to claim that because he took all actions on behalf of the company he cannot be personally liable. Under Ohio law, a corporate officer can be held personally liable for a tort committed while acting within the scope of his employment. See, e.g., Atram v. Star Tool & Die Corp., 64 Ohio App.3d 388, 581 N.E.2d 1110, 1113 (1989); Bowes v. Cincinnati Riverfront Coliseum, Inc., 12 Ohio App.3d 12, 465 N.E.2d 904, 911 (1983). The evidence in this case supports the district court's findings of fact, and those findings satisfy the Bestfoods requirement that an officer be actively involved in the arrangements for disposal before individual liability may be imposed. Denune was properly held to be individually liable.
 
 
 29
 E. Several or joint and several liability.
 
 
 30
 This court reviews de novo the district court's determination that although the harm caused by Dixie and Denune was indivisible, their liability must be several as a matter of law. It is not necessary, however, that we reach Carter-Jones's argument as to this court's ability to create joint and several liability in a CERCLA contribution case by using its equitable powers and the federal common law. Application of the law of Ohio corporations to CERCLA liability may well resolve the issue.
 
 
 31
 Application of Ohio law is appropriate in resolving liability issues relating to corporations and officers, as explained by the Supreme Court when it applied the state law for piercing the corporate veil in CERCLA cases. See Bestfoods, 118 S.Ct. at 1885.
 
 
 32
 CERCLA is ... like many another congressional enactment in giving no indication that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute, and the failure of the statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that in order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law.
 
 
 33
 Id. (internal citations and quotations omitted). It is correct that unrelated defendants are to be made severally liable only, rather than jointly and severally liable, in an action for contribution under CERCLA. See Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 356 (6th Cir.1998). However, CERCLA's regulation of an environmental tort should not and does not relieve a corporation, its officers, or its owners of their bargained-for duties and liabilities as they do business in the corporate form. Section 113(f) of CERCLA, the section governing contribution actions, in no way addresses issues of corporate liability,[1] and it should not therefore be presumed to alter state laws governing the liability of corporations vis a vis their officers and owners.
 
 
 34
 Denune is personally liable for his active role in the arrangement for disposal, and, as he makes clear, he performed the acts which resulted in the release of hazardous substances in his role as an officer of Dixie. In Ohio both a corporation and an officer are liable for wrongful acts committed by an officer in performance of his corporate duties. See Atram, 581 N.E.2d at 1113. Joint and several liability between Dixie and Denune for Denune's share of the response costs is therefore appropriate.
 
 
 35
 If the corporate veil may be pierced under Ohio law to reach Denune as the sole shareholder, then he will be jointly and severally liable for Dixie's share of the response costs. See Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos., Inc., 67 Ohio St.3d 274, 617 N.E.2d 1075, 1085 (Ohio 1993). Under Ohio law,
 
 
 36
 the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.
 
 
 37
 Id. at 1086. The district court did not address the issue of veil piercing, and this court does not have sufficient evidence before it to make its own determination at this time.
 
 
 38
 Because the district court's application of the Ohio law of corporations to the facts of this case may well preclude the need for this court to address Carter-Jones's argument that § 113 of CERCLA itself allows for joint and several liability when equity requires, we need not and do not reach that question here. The district court's determination that Dixie and Denune's liability must be several as a matter of law is reversed, and the case is remanded to the district court for further consideration consistent with this decision.
 
 
 39
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 [1]
 (1) Contribution
 Any person may seek contribution from any other person who is liable or potentially liable under section [107(a) ], during or following any civil action under section or under section [107(a) ]. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing is this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section or section .
 42 U.S.C. § 9613(f)(1).