[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 99-8241

_____

D. C. Docket No. 95-00525-5-CV-1-WDO

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 15 2000
THOMAS K. KAHN
CLERK

CONCRETE SALES AND SERVICES, INC., a
Georgia corporation,

Defendants-Cross-Claimant,
Counter-Claimant-Appellant,

FRANCES M. COODY, as trustee for the
Irrevocable Trust of T. A. McCord, Jr.,
TIMOTHY A. MCCORD, as Trustee for
the Irrevocable Trust of T. A. McCord, Jr., et al.,

Defendants-Cross-Claimants,
Counter-Claimants-Third Party
Plaintiffs-Appellants,

versus

BLUE BIRD BODY COMPANY,
CARDINAL MANUFACTURING
COMPANY, et al.,

Third Party Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____
**(May 15, 2000)**

Before COX, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

This case requires us to determine whether two companies that contracted for a third company's electroplating services and had additional interactions with the third company "otherwise arranged for" the disposal of hazardous substances under 42 U.S.C. § 9607(a)(3), part of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). We agree with the district court's conclusion that the evidence presented is insufficient to establish arranger liability.

## I. BACKGROUND

Briggs & Stratton Corporation filed the original complaint in this action to recover costs incurred to clean up hazardous waste at the site of a defunct electroplating facility. Briggs and Stratton sought contribution from others connected to the site, including: Frances M. Coody and Timothy A. McCord, as Trustees of the Irrevocable Trust of T.A. McCord, Jr. (the McCord Trust), a former owner of the

2

property;[1] T.A. McCord, Jr., individually, who conveyed the property's title to the McCord Trust; Concrete Sales and Services, Inc. (Concrete Sales), a corporation wholly owned by the McCord Trust that also held title to the property;[2] and Alvin E. DeGraw, Jr., the president of the company that ran the electroplating facility. *See* 42 U.S.C. §§ 9607(a), 9613(f), and 9613(g).

Although the McCord Trust paid approximately $300,000 in clean-up costs before this lawsuit, the district court concluded that the McCord Trust was responsible for an additional $1.3 million of the $5.2 million in clean-up costs paid by Briggs & Stratton. The McCords in turn sought contribution from, among others, Peach Metal Industries, Inc. (PMI), the company that did the electroplating; and Blue Bird Body Company, Cardinal Manufacturing Company (collectively, Blue Bird), and Simplex Nails (Simplex), all customers of PMI. The district court granted summary judgment in favor of Blue Bird and Simplex, and this appeal by the McCords followed.

By all accounts, PMI caused the environmental contamination. From approximately 1971 to 1987, PMI operated an electroplating and galvanizing facility on the site. PMI generated hazardous waste as an inherent part of its electroplating

---

[1]    Peach County, Georgia currently holds title to the property.

[2]    We refer to the McCord Trust, McCord and Concrete Sales collectively as the McCords.

3

processes and disposed of this waste by dumping it onto the ground and storing it in unlined lagoons and drums on the site. PMI was thinly capitalized, had few or no assets, and operated "on a shoestring" in a dilapidated facility. DeGraw[3] and PMI eventually sought bankruptcy protection.

Blue Bird, a bus and motor-home manufacturer,[4] and Simplex, a nail manufacturer, outsourced their electroplating to PMI. Both customers set electroplating standards and returned any unsatisfactory work to PMI to be re-done, but Blue Bird, PMI's biggest customer, had the closer relationship with PMI. Blue Bird outsourced all of its electroplating to PMI. Blue Bird's blueprints and purchase orders instructed PMI as to the type and thickness of the coating to be electroplated to its parts.[5] The purchase orders also required PMI to comply with all federal, state

---

[3]    DeGraw succeeded his father as owner and operator of the electroplating facility in 1981. DeGraw's father, the original owner and operator of the electroplating facility, worked for Blue Bird Body Company before opening the facility.

[4]    Cardinal Manufacturing Company manufactured bus parts that were assembled by Blue Bird Body Company. Blue Bird Body Company and the Luce family owned and controlled Cardinal; the Luce family also owned Blue Bird Body Company.

[5]    For example, some of the purchase orders specified "Zinc plate 2 to 2.5 mil plus 2 to 3 mil Dry Phosphate Coating (No Oil) Neutralized Rinse," "Zinc Plated w/Yellow," "Cadmium Plated," and "Zinc Plate per GM Specification No. 4252-M 0.0003 Thick Minimum." (R.12-344, Ex. 12.)

and local laws, regulations and orders, specifically including the Toxic Substance Control Act.

Both customers did somewhat more than simply contract with PMI. In fact, both customers provided financial support to PMI. Simplex once loaned or advanced money to PMI, and Blue Bird twice loaned money to PMI.[6] One of Blue Bird's loans to PMI occurred shortly after the Georgia Environmental Protection Division cited Blue Bird for environmental violations.

Both companies also had some awareness of the possibility of a waste problem at PMI. Simplex's president understood that electroplating and galvanizing produced hazardous waste; however, he never inquired about PMI's disposal practices. Blue Bird also knew that hazardous waste would be produced by PMI. Blue Bird never inquired about PMI's disposal practices either, despite Blue Bird's contractual authority to require compliance with environmental laws and its knowledge that PMI's buildings were in poor condition.

---

[6] The McCords also argue that Blue Bird purchased hazardous substances for PMI's use, as demonstrated by two Blue Bird purchase orders. The first purchase order, however, shows only that Blue Bird purchased chemicals from PMI, to be shipped to Blue Bird; the second shows that Blue Bird purchased chemicals from PMI to be shipped to "same." (R.12-344, Ex. 5.) Even if the second document is some evidence that Blue Bird purchased hazardous substances from PMI, to be shipped to PMI, which seems illogical at best, PMI has not shown that these substances were used by PMI. We therefore conclude that there is no evidence that Blue Bird directly purchased hazardous substances for PMI's use.

## II. DISCUSSION

The McCords contend that the relationships between PMI and Simplex and PMI and Blue Bird are sufficient to establish a question of material fact as to Simplex's and Blue Bird's liability for PMI's disposal of hazardous waste. We review the district court's grant of summary judgment to Blue Bird and Simplex de novo, applying the same familiar standards as the district court. *See Gitlitz v. Compagnie Nationale Air France*, 129 F.3d 554, 556-57 (11th Cir. 1997).

### A. Arranger Liability under CERCLA

The McCords brought their contribution claims against Simplex and Blue Bird pursuant to CERCLA §§ 107(a) and 113(f).[7] Section 113(f) authorizes any person to seek contribution from any other person who is or may be liable under § 107(a) of CERCLA. *See* 42 U.S.C. § 9613(f). The McCords argue that Blue Bird and Simplex are liable under § 107(a)(3) because they "arranged for" the disposal of hazardous substances by PMI. Section 107(a)(3) of CERCLA imposes liability on:

> any person who by contract, agreement, or otherwise *arranged for disposal* or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

---

[7] These sections are codified at 42 U.S.C. §§ 9607(a) and 9613(f), respectively.

42 U.S.C. § 9607(a)(3) (emphasis added).

CERCLA does not define "arranged for," and we have held that arranger liability determinations are to be made based on the facts of each individual case. *See South Fla. Water Management Dist. v. Montalvo*, 84 F.3d 402, 406-07 (11th Cir. 1996). We have pointed to several factors considered by courts to evaluate whether a party arranged for the disposal of hazardous waste under § 9607(a)(3); none of these factors, however, is dispositive. *See id.* Relevant factors include: (1) whether a sale involved the transfer of a "useful" or "waste" product; (2) whether the party intended to dispose of a substance at the time of the transaction; (3) whether the party made the "crucial decision" to place hazardous substances in the hands of a particular facility; (4) whether the party had knowledge of the disposal; and (5) whether the party owned the hazardous substances. *See id.* (citations omitted).

In the present case, therefore, the McCords must produce evidence that would allow a reasonable jury to infer from the totality of the circumstances that Blue Bird or Simplex arranged for PMI's disposal of hazardous substances owned or possessed by Blue Bird or Simplex. We evaluate each customer's relationship with PMI on its own facts, addressing Simplex first.

B. Simplex

7

The McCords argue that Simplex's contracting with PMI amounted to "willful blindness" as to PMI's disposal processes because Simplex controlled the parts that PMI electroplated for Simplex, knew that hazardous waste would be generated from the electroplating, and loaned or advanced money to PMI. Simplex responds that Simplex never owned or possessed hazardous substances, did not have any authority or obligation to exercise control over the hazardous waste, never took an affirmative step to dispose of the hazardous waste, and did not know that PMI improperly disposed of hazardous waste.

The evidence is insufficient to show that Simplex arranged for the disposal of hazardous substances at PMI's electroplating facility. The McCords have not established that Simplex took any action or had any intent to dispose of hazardous substances. While Simplex did loan or advance money to PMI on one occasion, no evidence supports a finding that Simplex gave this money for PMI to use for any specified purpose, such as the purchase of hazardous substances or the disposal of hazardous waste. Furthermore, while Simplex's president understood that hazardous waste would be generated by PMI's electroplating of Simplex's parts, the McCords have not shown that Simplex's president knew of or had the power to control PMI's disposal practices. We conclude, therefore, that no reasonable factfinder could find that Simplex arranged for the disposal of hazardous substances within the meaning of

8

42 U.S.C. § 9607(a)(3), and we affirm the district court's grant of summary judgment to Simplex.

## C. Blue Bird

We now turn to the more difficult question of the relationship between Blue Bird and PMI. The McCords argue that Blue Bird knew that hazardous waste was generated as an inherent part of PMI's electroplating and "arranged for" disposal of hazardous substances through its interactions with PMI. According to the McCords, Blue Bird had control over PMI and could have exercised control over PMI's hazardous waste disposal practices. The McCords point to the following facts that they contend would permit a jury to infer Blue Bird's control over PMI: First, a former Blue Bird employee founded PMI, and Blue Bird was PMI's biggest customer. Second, Blue Bird kept PMI in business by loaning PMI money to facilitate PMI's purchase of hazardous substances. According to the McCords, Blue Bird, therefore, made the conscious decision to put hazardous substances in PMI's hands and "constructively owned" the hazardous substances. Third, Blue Bird's invoices required PMI to comply with all applicable laws and one specific environmental law. Finally, Blue Bird dictated the electroplating services to be performed on its parts by PMI.

Blue Bird counters that it neither controlled nor had any duty to control PMI. First, although PMI was founded by a former Blue Bird employee, PMI was a separate and distinct corporate entity. Second, even if Blue Bird's loans somehow facilitated PMI's purchase of hazardous electroplating substances, the McCords have not shown that Blue Bird owned or controlled these hazardous substances, and Blue Bird made only two small loans during a sixteen-year business relationship. Third, although Blue Bird's purchase orders required PMI to comply with all applicable laws, the McCords have not shown that these requirements implied any duty for Blue Bird to police PMI's compliance. Finally, Blue Bird's electroplating instructions dictated the desired result, not the process to be used.

Next, the McCords contend that Blue Bird had enough information to infer that PMI was not properly disposing of its hazardous waste. According to the McCords, Blue Bird intentionally ignored signs that PMI was improperly disposing of hazardous waste. First, Blue Bird knew that hazardous waste was generated as an inherent part of the electroplating process. Second, Blue Bird employees knew that PMI's facilities were run-down. Third, Blue Bird employees saw machinery at PMI flinging waste water onto the floor. Finally, Blue Bird knew that PMI was operating "on a shoestring" and had financial problems.

Blue Bird responds that it had no knowledge of PMI's disposal practices. The facts that Blue Bird knew that PMI's facility was dilapidated, that some waste water went through a drain on the floor, and that PMI was, on at least the two occasions of the loans, experiencing financial difficulties, are insufficient (according to Blue Bird) to show that Blue Bird knew or even should have known that PMI was not properly disposing of its hazardous waste.

Finally, the McCords argue that the following facts demonstrate Blue Bird's intent to have PMI dispose of Blue Bird's hazardous electroplating waste: First, despite having contractual authority to demand compliance with hazardous-waste-disposal laws, Blue Bird never even inquired as to PMI's compliance. Moreover, PMI was the only electroplating facility near Blue Bird, and Blue Bird knew that without PMI, Blue Bird would have to do its own electroplating and deal with additional hazardous waste disposal, at a time when Blue Bird was already under scrutiny by the Georgia Environmental Protection Division.

Blue Bird makes three responses regarding its alleged motive and intent to have PMI dispose of Blue Bird's hazardous waste. First, Blue Bird again argues that requiring a vendor to comply with applicable laws does not imply a duty to police that vendor's compliance. Second, Blue Bird never did its own electroplating, and any problem with the Georgia Environmental Protection Division did not involve

11

hazardous electroplating waste. Finally, Blue Bird's intent was to purchase PMI's services to add value to Blue Bird's useful products, not to dispose of hazardous waste.

We conclude that the evidence presented has not created a genuine issue of material fact regarding whether Blue Bird used PMI to "otherwise arrange for" the disposal of Blue Bird's hazardous waste. The McCords have not produced sufficient evidence to permit a jury to infer that Blue Bird intended to dispose of hazardous substances through PMI. The majority of Blue Bird's interactions with PMI involved a simple contract for a useful service, the addition of electroplated finishes to Blue Bird's parts. Admittedly, Blue Bird also provided financial assistance that facilitated PMI's purchase of hazardous substances. Blue Bird's facilitation of the purchase of hazardous substances, however, does not, in the limited circumstances of this case, show that Blue Bird owned, possessed, or even had the ability to control the hazardous substances.

Pointing to Eighth Circuit authority, the McCords maintain that Blue Bird's intent to arrange for the disposal of hazardous waste can be inferred from Blue Bird's knowledge of PMI's disposal practices and ability to control PMI. *See United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373 (8th Cir. 1989). In *Aceto,* the complaint alleged that the defendants, while retaining ownership of the work-in-progress,

12

contracted to have the polluter dilute technical-grade pesticides into commercial-grade pesticides; hazardous waste inherently resulted. *See id.* at 1378. The court concluded that these factual allegations were sufficient to state a claim for arranger liability. *See id.* at 1382. The McCords urge the application of *Aceto* to the present facts because Blue Bird similarly owned the parts that were electroplated and "constructively owned" at least some of the hazardous substances used to complete the electroplating; hazardous waste inherently resulted.

*Aceto* is inapposite. The *Aceto* defendants owned all of the hazardous substances, the hazardous substances were the work-in-progress, and the spillage of this work-in-progress was the hazardous waste. In contrast, here, the McCords' theory is that Blue Bird somehow "constructively owned" a small portion of the hazardous substances used PMI. The work-in-progress, owned by Blue Bird consisted of useful metal parts. Blue Bird contracted for the addition of electroplated finishes to a product that was not, before or after the electroplating, a hazardous substance. Instead, hazardous waste was an inherent by-product of the electroplating process.

We also conclude that the McCords have not shown that Blue Bird had sufficient knowledge or control of PMI's disposal practices to trigger arranger liability. Blue Bird knew that, during the last few years of its existence, PMI was having financial difficulties and operating in a dilapidated facility. This knowledge,

13

however, falls shy of knowledge that PMI was improperly disposing of hazardous waste. Despite the fact that Blue Bird assisted PMI financially with two loans, the McCords have not produced any evidence that Blue Bird used financial leverage to even attempt to control or direct PMI's operation or disposal practices. Finally, we conclude that Blue Bird's requirement that PMI comply with all applicable laws did not imply a duty for Blue Bird to police PMI's compliance. We therefore affirm summary judgment in Blue Bird's favor.

## III. Conclusion

Although arranger liability should be liberally construed to promote CERCLA's remedial scheme, permitting a jury to find Blue Bird or Simplex to be arrangers would stretch the meaning of "arranged for" beyond a reasonable reading of the statute. *See South Fla. Water Management Dist. v. Montalvo*, 84 F.3d 402, 409 (11th Cir. 1996). If Congress wishes to impose CERCLA liability on parties who contract for services that produce hazardous waste, it, not us, has the authority to do so. We emphasize, however, that our opinion does not foreclose the possibility that a party could so control and benefit from another company's production of hazardous waste that arranger liability would arise under 42 U.S.C. § 9607(a)(3). Our conclusion is simply that this case does not present those circumstances.

For the foregoing reasons, the district court orders granting summary judgment in favor of Simplex and Blue Bird are hereby

AFFIRMED.