NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0193n.06

Nos. 20-2257/2267

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>

GOULD ELECTRONICS INC.,

    *Plaintiff-Appellant/Cross-Appellee,*

v.

LIVINGSTON COUNTY ROAD COMMISSION,

    *Defendant-Appellee/Cross-Appellant.*

</td>
<td>

)
)
)
)
)
)
)
)
)
)
)
)

</td>
<td>

**FILED**
May 10, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

</td>
</tr>
</table>

Before: BOGGS, GIBBONS, and NALBANDIAN, Circuit Judges.

BOGGS, Circuit Judge. This case concerns a near-thirty-year dispute about environmental cleanup at the site of the former Roosevelt Street Factory in Livingston County, Michigan. Between 1961 and 1976, the property was owned by Gould Electronics. Immediately adjacent to the property is a facility owned since 1933 by the Livingston County Road Commission. Both tenants appear to have used the carcinogenic degreasing agent trichloroethylene (TCE) on their properties. In 1993, the Michigan Department of Environment, Great Lakes, and Energy discovered that an area straddling both parcels contained dangerous levels of TCE. The Department identified both tenants as potential polluters. Predictably, each blamed its neighbor and sought to recover costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607(a), and its state equivalent.

In 2009, after the Department ordered Gould to clean up the entire affected area, Gould sued the Commission to apportion liability for any TCE contamination. In 2012, just before trial,

the parties signed a tolling agreement and agreed to stay the litigation while the Department considered who was liable. When the Department finally reached a conclusion in 2017—that it could not tell who was liable—Gould revived the suit. The Commission then moved to amend its answer and file a CERCLA counterclaim under 42 U.S.C. § 9613(f), a request the district court granted. In mid-2020, the court decided not to delay the trial amid the COVID-19 pandemic, instead conducting it by online videoconference over the objections of both parties.

After hearing from dueling experts in a seven-day bench trial, the district court found that Gould had been the "sole cause" of the TCE contamination. Using its equitable powers, however, the court considered the Commission's lack of care with respect to the contamination that had seeped onto its property, as well as its repeated refusal to cooperate with the Department's investigations, and decided to hold Gould only 95 percent liable for the costs of the cleanup (effectively reducing the Commission's recovery by 5 percent of Gould's costs, or $212,664.85). Gould was ordered to pay the Commission a net total of $962,153.07.

Gould now alleges a host of procedural and substantive defects related to the bench trial, and the Commission, cross-appealing, objects to the district court's apportionment of 5 percent of the cleanup liability. For the reasons below, we affirm the judgment of the district court in its entirety.

## BACKGROUND

In 1993, the Michigan Department of Environment, Great Lakes, and Energy identified hazardous substances in the soil at the Roosevelt Street Factory dating from the tenancy of Gould Electronics.[1] Gould had used the factory to manufacture pistons and connecting rods between 1961 and 1976, while the factory's neighbor, the Livingston County Road Commission, operated

---

[1] Unless otherwise noted, the facts in this section are taken from the final opinion and order of the district court dated November 19, 2020.

a facility that since 1933 conducted vehicle repairs and asphalt tests and stored materials for salting roads. The initial contamination was detected on Gould's property, but near the boundary between the parcels. Upon further investigation, the Department detected large quantities of the toxic chemical TCE, which is a carcinogen and was once a common degreasing agent. Gould was ordered to remove enough of the soil to remedy the contamination—but it was not enough. Shortly thereafter, the Department found TCE-contaminated groundwater in the aquifer straddling the factory and the storage facility.

The Department identified both Gould and the Commission as potential sources of the TCE and the site was officially designated a "facility" under CERCLA. Because CERCLA allows property owners to sue each other for the costs of environmental cleanup, both parties hired consultants to take measurements, prepare reports, and generally contest their liability. Gould then sued the Commission in 2009 to recover response costs,[2] alleging that the Commission was at least partly responsible for the TCE contamination. *See* 42 U.S.C. § 9607(a)(4)(B). Just before trial, in 2012, the parties determined it would be more efficient to allow the Department to complete its assessment of liability first; to that end, they signed a tolling agreement that preserved the litigation but stayed it until the Department weighed in. Included in the agreement was a preambulatory clause expressing the parties' desire "to conserve resources and avoid unnecessary litigation time and expense while simultaneously preserving their current respective rights, defenses and litigation positions." Five years later—much longer than expected—the Department issued a letter concluding that while none of the TCE released on the Commission's property was "demonstrated to be directly attributable to [the Commission's] historic operations," it "cannot agree or disagree with"

---

[2] Because the contaminated groundwater had been seeping toward nearby Thompson Lake, the Department ordered Gould to undertake a comprehensive environmental cleanup of the entire affected area across both parcels. Gould did this and, in accordance with CERCLA, now contests its liability with respect to cleanup costs after the fact.

the Commission's theory that Gould was responsible. Gould then revived the litigation as contemplated in the tolling agreement.

This time around, both parties filed motions seeking to file new pleadings that would go beyond the scope of the first case, which the district court denied. The court insisted that in the second case the parties abide by the pleadings as they had been in the first case. Months later, after discovery, the Commission again sought leave to add a CERCLA contribution counterclaim. *See* 42 U.S.C. § 9613(f). Because the statutory scheme allows such counterclaims to be brought either "during or following" a civil CERCLA claim, *ibid.*, and because of Federal Rule of Civil Procedure 15's generous pleading standards, the court reversed course and granted the motion. The parties then prepared for trial.

At that point, in mid-2020, the COVID-19 pandemic had forced much of the justice system to slow or halt. Over the objections of the parties, the district court decided to go forward with the bench trial using videoconferencing services. The virtual trial took place over seven days, with each side offering experts and evidence. At its conclusion, the district court issued a 108-page opinion in which it (1) excluded certain evidence presented by Gould on the grounds that it was presented by an expert who was not a specialist in the field and who did not prepare the reports himself; (2) found Gould to be the "sole cause" of the TCE contamination, though only 95 percent liable for the Commission's costs; and (3) held the Commission 5 percent liable for Gould's costs because of the Commission's dilatory tactics and refusal to cooperate with the Department. By then, Gould had spent more than $4.25 million responding to the contamination; the Commission had spent about $1.25 million. After subtracting the Commission's 5 percent liability from 95 percent of its costs, the Commission was awarded $962,153.07. Gould now appeals, and the Commission cross-appeals the reduction of its award.

**ANALYSIS**

Gould claims that (1) under the terms of the tolling agreement, the Commission should never have been permitted to amend its answer and bring a counterclaim; (2) the remote bench trial was plagued by technological problems that violated Gould's due-process rights; (3) the district court improperly excluded evidence presented by Gould's expert; (4) the finding that Gould was the sole cause of TCE was clearly erroneous; and (5) the $1.25 million spent by the Commission to hire an environmental consultant is not recoverable under CERCLA. The Commission, cross-appealing, objects to the district court's equitable apportionment to it of 5 percent of the cleanup liability, claiming that it did in fact exercise due care in dealing with the contamination.

**A. The 2012 Tolling Agreement**

Gould's principal argument on appeal is that the 2012 contract staying the litigation should have prevented the Commission from bringing a contribution counterclaim once the case was revived in 2017. We review the district court's ruling on the motion to amend the pleadings for abuse of discretion, *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 304 (6th Cir. 2011), and will reverse if we have "a definite and firm conviction that the trial court committed a clear error of judgment," *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008) (citation omitted).

> The relevant language in the tolling agreement is as follows:
>
> WHEREAS, the Parties wish to conserve resources and avoid unnecessary litigation time and expense while simultaneously preserving their current respective rights, defenses and litigation positions.
> . . .
> If a New Case is filed, the current record, pleadings, Joint Final Pretrial Order, discovery, expert reports, legal positions of the parties, etc. in the Lawsuit shall be preserved as applicable and binding in the New Case as they currently are in the Lawsuit.

Gould seizes on the verb "preserve" to claim that the purpose of the agreement was to freeze the parties' litigation positions for all time, and that when the litigation resumed, each of the claims and defenses should have been identical to those in the original suit—which did not include a contribution counterclaim—and not subject to alteration or amendment in the conventional course of litigation. In support of its position, Gould correctly notes that the district court had previously denied the Commission's request to bring a contribution counterclaim at the inception of the second case. But that denial should be placed in its proper context. Both parties had filed motions seeking to expand their claims: Gould wanted to add a cost-recovery claim for salt contamination (in addition to TCE contamination), and the Commission wanted to add a CERCLA counterclaim, new affirmative defenses, and a jury demand. In light of the "preserve" language in the tolling agreement, the court insisted that "the parties were to pick up where they left off," and the pleadings were to be presented as they had been in the first case: no salt-contamination claim for Gould, no new defenses or claims for the Commission.

Seven months later, after extensive discovery, the Commission again asked the court for leave to bring a § 9613(f) contribution counterclaim—with a different result.[3] Because the statute allows a party to seek contribution from any other "potentially liable" party "during *or following* any civil action" for CERCLA costs, 42 U.S.C. § 9613(f) (emphasis added), the Commission made clear that "denying [ ] the right to seek contribution in the present action will not prevent [a] court from hearing its contribution claim" in a later action. With the understanding that the Commission would assert its right to recover a portion of costs from Gould regardless of the court's decision,

---

[3] This time, the Commission did not attempt to add additional affirmative defenses or a jury demand to its pleadings. Nor did Gould revive its salt-contamination cost-recovery claim, though nothing indicates that the district court would not have entertained additional requests for reconsideration.

and reasoning that consolidation would better serve the interests of judicial administration, this time the court granted the motion to amend.

Gould now insists either that the court should have been held to its earlier ruling or that the tolling agreement restricted the second case to only those claims and defenses that existed when the first case was stayed. As to the former point, there is no inconsistency between the district court's first and second rulings. The fact that the district court insisted that the parties present the second case as they had presented the first one is consistent with the tolling agreement; because the agreement preserved the parties' claims and defenses, the court refused to entertain either side's attempts to reframe their arguments at the start of the second case. After discovery, and once it became clear that the court was essentially already deciding the merits of the counterclaim (because it would require the court to determine precisely the same equities as Gould's CERCLA claim, i.e., the extent to which each party was responsible for the TCE contamination), the court reconsidered and allowed the amendment. Doing so saved time and resources, since the Commission promised to bring the counterclaim as a separate suit regardless.

As to Gould's latter argument, the tolling agreement did not merely preserve the parties' positions when the litigation was frozen. The text makes clear that it also preserved their "rights." Gould would have us hold that a tolling agreement written to ensure that the parties restart where they left off instead precluded the Commission from asserting its counterclaim until *after* the close of the litigation, even though the statutory scheme entitles litigants in the Commission's position to assert counterclaims "during *or* following any civil action" like the one here. *See* 42 U.S.C. § 9613(f) (emphasis added). Besides, there is no reason the Commission could not have brought a contribution counterclaim during the first suit (i.e., before the tolling agreement), and nothing in

the tolling agreement prevents the parties from properly amending their pleadings as would be the case in the normal course of litigation.

The district court found reason not to grant the Commission's motion when the pleadings in the second suit were filed (in the interest of preserving the first suit before discovery). When it reversed course later, it did so with the understandings that (1) the Commission would have brought the counterclaim as a separate action in any case and (2) a consolidated resolution of the case was preferable to piecemeal adjudication. The court's initial denial was interlocutory, and certainly not unchangeable. Under the circumstances, this was not an abuse of discretion.

## B. The Bench Trial

Gould brings three procedural or substantive challenges to the bench trial. It asserts that (1) the remote trial deprived it of due process, (2) the district court incorrectly excluded the testimony and reports of its expert from evidence, and (3) the court's factual findings were clearly erroneous. As explained below, none of these arguments succeeds.

### 1. Due Process

The COVID-19 pandemic prevented the district court from conducting the trial in person as scheduled. Faced with this, both parties asked that the trial be delayed, but the court opted instead to proceed virtually. Gould describes the seven days of remote arguments as "technologically plagued" and insists that the impacts on credibility determinations and cross-examination deprived Gould of due process. Some examples Gould alleges include requiring counsel to set up videoconferencing software to participate, difficulty hearing what Gould's expert was saying, and conversational disruptions to what might otherwise be a smooth line of questioning.

As an initial matter, the cases Gould cites when describing the purported requirements of due process are hopelessly out of date considering the facts of *this* case. Videoconferencing

technology in its current form is relatively new, but the mean year of the precedential cases Gould relies on is 1993—meaning the due-process-related quotations Gould draws from those cases do not address the question of videoconferencing technology, and indeed describe an era that is long past.[4] Moreover, a sizeable portion of the population has adopted videoconferencing technology for everyday use during the COVID-19 pandemic, including and especially members of the legal profession.[5]

Gould's clearest legal argument is that the district court violated the Confrontation Clause by conducting cross-examination remotely. *See* U.S. Const. amend. VI. But the case it cites to that effect is inapposite. *Stoner v. Sowders*, a Sixth Circuit case from 1993, concerned the propriety of video*taped* testimony, not live video testimony. 997 F.2d 209 (6th Cir. 1993). As this court recognized, it was the lack of "a sufficient showing of [the witnesses'] unavailability to give live testimony" that gave rise to the constitutional violation. *Id.* at 210, 213–14. Here, all witnesses were available and were in fact cross-examined. The *Stoner* court had no occasion to analyze whether video testimony with live questioning would satisfy the Sixth Amendment, because the technology as we know it did not exist.

Gould acknowledges that its due-process challenge "is a fact-specific determination," First Br. for Appellant 43, but offers little evidence that this case in particular was inappropriately conducted. An examination of the trial transcript reveals that the technological difficulties were not as dire as Gould makes them out to have been. As an example, Gould highlights the exchange

---

[4] *See generally, e.g.*, *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985); *Jackson v. Virginia*, 443 U.S. 307 (1979); *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Greene v. McElroy*, 360 U.S. 474 (1959); *United States v. Burke*, 345 F.3d 416 (6th Cir. 2003); *Stoner v. Sowders*, 997 F.2d 209 (6th Cir. 1993).

[5] The American Bar Association has noted a sharp increase in lawyers' use of videoconferencing technology even prior to the start of the trial in this case. Ellen Rosen, *The Zoom Boom: How Videoconferencing Tools Are Changing the Legal Profession* (ABA Journal June 3, 2020), *available at* https://www.americanbar.org/groups/journal/articles/2020/the-zoom-boom-how-videoconferencing-tools-are-changing-the-lega/ (last visited Mar. 22, 2022).

between the district court and Gould's lead expert, John Browning. But while the court did repeatedly ask Browning to speak up in his very first minutes of testifying, once it became clear that it was difficult to hear, Browning switched off the in-app videoconferencing audio and called in on his phone, and the problem was solved. Indeed, the court recognized that the problem was serious enough to take a break "until we get him set up right." As the Commission correctly notes, Browning then went on to testify for days. Those familiar with videoconferencing software will note that minor adjustments are usually necessary when beginning, and as participants become more familiar with the format, quality improves. Here, both parties' extensive questioning of Browning shows that any initial problem did not rise to the level of a due-process violation.

Because Gould has not presented evidence that the videoconferencing format generally violates due process, and does not point to anything in the record demonstrating that in this case in particular it was unable to cross-examine witnesses or the court was unable to determine credibility, Gould received all the process it was due.

2. *Evidentiary Rulings*

Gould raises evidentiary challenges to two of the district court's rulings. First, the court excluded the testimony of Gould's environmental expert John Browning, because Browning based his analysis entirely on the work of a different expert, Thomas Cok (who did not testify). Second, the court declined to allow the introduction of reports prepared by Cok, because those reports were hearsay not subject to any exception and because Cok did not testify. These two evidentiary rulings are reviewed for abuse of discretion and should only be reversed if they "affected the outcome of the trial"—i.e., were not mere harmless error. *United States v. Morales*, 687 F.3d 697, 701–02 (6th Cir. 2012) (citation omitted). For the reasons below, both of Gould's challenges fail.

As noted above, Gould's expert, John Browning, testified over multiple days of the bench trial. Through Browning's testimony, Gould also attempted to introduce reports prepared by Thomas Cok, a member of Browning's firm, the Mannik & Smith Group. Both the testimony and the reports detailed Mannik & Smith's "contouring maps depicting the elevation of the intermediate clay layer and the pattern of groundwater flow," as well as the site's subsurface geology, in support of Gould's theory that the Commission spilled TCE that migrated to Gould's property. During the trial, the court allowed Browning to testify, but excluded Cok's reports because Cok was unavailable and thus not subject to cross-examination. After trial, the court stated that it was excluding Browning's testimony from its decision-making on the ground that Browning had failed to provide a foundation for his opinions as required by Federal Rule of Evidence 702.

Neither evidentiary ruling is reversible as an abuse of discretion because any error was plainly harmless. In a lengthy opinion, while the district court found both Browning's testimony and Cok's reports to be inadmissible, it considered the merits of *both* and found them to be unpersuasive in any event. *Gould Elecs. Inc. v. Livingston Cnty. Road Comm'n*, No. 17-11130, 2020 WL 6793335, at *9 (E.D. Mich. Nov. 19, 2020) ("[E]ven if the Court were to consider this testimony, it would not consider the testimony to be persuasive."). On the merits, the court cited to Browning's testimony with respect to (1) the direction of the TCE contamination, (2) Gould's methods of addressing the contamination, (3) the demarcation between Gould's and the Commission's properties between 1950 and 1970, (4) the locations where TCE was detected, (5) how to measure groundwater based on adjacent wells, (6) the possible directions of groundwater flow (a prominent merits argument by Gould on appeal), and numerous other fact-intensive issues. On each of these occasions, the court treated Browning's testimony as if it were admissible. *E.g.*, *id.* at *23 ("Even assuming that Browning is qualified to testify . . . ."). And as noted above,

Browning's testimony was based in large part on Cok's reports, which the court occasionally mentioned when citing Browning. *E.g.*, *id.* at \*28 ("[Browning's] conclusion was premised on [Mannik & Smith's] drawings of cross-sections of the subsurface geology."). By all indications, then, the court reasoned through its opinion as if Browning's testimony and Cok's reports were in evidence.

Any error in excluding the testimony and reports was therefore harmless because neither was excluded from the district court's analysis in practice. The district court examined the merits of Browning's testimony in full, compared it against the Commission's evidence, and found the latter more persuasive. Regardless of whether it was an abuse of discretion for the district court to note that Browning's testimony did not meet the evidentiary standards for admission and should not have been included during the trial, the court's full consideration of that evidence renders any error harmless.

### 3. *Factual Findings*

Finally with respect to the bench trial, Gould brings a merits challenge to the court's factual finding that Gould was the "sole cause" of TCE contamination at the site. We review factual findings for clear error, meaning "the definite and firm conviction that a mistake has been committed." *Holt v. City of Battle Creek*, 925 F.3d 905, 910 (6th Cir. 2019) (citation omitted).

At trial, it became clear that there were no records clearly indicating that Gould had spilled TCE on its property. The case was simply too old, and too many of Gould's former employees had passed away. What the district court did find was that Gould had dumped some kind of waste chemical in large quantities onto the soil in precisely the spot where the Department would later detect huge quantities of TCE and other contaminants. While the lack of records meant that "none of the testimony directly links Gould Inc. to TCE usage," there were "extraordinarily high

concentrations of TCE" in "one of the very areas where employees poured fluids on the ground." *Gould Elecs.*, 2020 WL 6793335, at \*33. Additionally, because the issue was the apportionment of liability as between the two parties, the Commission's activities during the relevant time period were just as important as Gould's. And as the court explained, Gould presented "no evidence demonstrating that there were *any* deposits of TCE onto soils on" the Commission's property.[6] *Ibid.* (emphasis added). Taken together, the evidence showed that "no disposal of TCE occurred on the [Commission's] Property," and "Gould Inc., and not [the Commission], generated the TCE contamination." *Ibid.*

Gould argues forcefully that the district court should have accepted the alternative theory that, because Gould preserved no records, it is not responsible for the thousands of gallons of TCE found under the spot where Gould's employees had been dumping waste chemicals. Even considering that argument, Gould has not met its burden here. Recognizing that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," we affirm the district court's plausible factual findings. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

## C. "Necessary Costs of Response" Under CERCLA

Gould's last contention on appeal is that none of the Commission's $1.25 million in costs is recoverable under CERCLA. For the definition of a recoverable cost, we look to § 9613(f), where the described liability for "contribution" cross-references § 9607 to hold parties liable only for another's "necessary costs of response." 42 U.S.C. § 9607(a)(4)(B). And "'respond' or

---

[6] Gould, on appeal, makes much of the fact that the Commission concededly disposed of small quantities of TCE at its facility. But as the record shows, any TCE used by the Commission was disposed of in the proper manner: by contracting a waste-disposal company to haul away the dangerous chemicals, not by dumping them on the ground.

'response' means remove, removal, remedy, and remedial action."[7]  42 U.S.C. § 9601(25).  The Supreme Court has also stated what response is *not*: lawyers' fees, at least, are not recoverable unless the "lawyers' work [ ] is closely tied to the actual cleanup."  *Key Tronic Corp. v. United States*, 511 U.S. 809, 820 (1994).  In this circuit and others, a two-part test of sorts has emerged, in that costs must be both necessary and "incurred in response to a threat to human health or the environment."  *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 700 (6th Cir. 2006).

The costs incurred by the Commission here consisted entirely of the work performed by its environmental consulting firm, as well as the expert it retained for the bench trial.  The nature of the work was, as both sides allow, "investigatory," and primarily centered on the Commission's efforts to convince the Department that it was not the source of the TCE contamination.  *See* Third Br. for Appellant 13–15.

Seizing on the holding in *Key Tronic*, Gould repeats language from circuit cases that refer to *Key Tronic* using phrases like "legal fees" and "litigation-related costs," but Gould *expands* Supreme Court precedent and describes the Commission's prohibited costs as those "aimed at exonerating itself from liability."  *Id.* at 10.  A distinction should be drawn, at the outset, between fees paid to lawyers (who investigate and litigate cases) and fees paid to environmental consulting firms (who investigate in a different sense and prepare maps and reports).  The Commission's costs are not the former, regardless of whether they uncovered evidence later used by lawyers.  The question, then, is whether the costs of environmental consultation are more like "litigation-related costs" or like covered "costs of response."  The answer is plainly the latter.  The justification in *Key Tronic* for excluding litigation costs was that courts compensating lawyers is extraordinary; the Court expressed doubt that a fee award would be implied in the statute.  511 U.S. at 818.  By

---

[7] The Commission may have been correct to describe CERCLA as a "labyrinth."

contrast, there is no special disfavoring of consulting costs, and any private landowner accused of contaminating its property would be well advised to seek out an independent determination of how responsible it is and how bad the damage is—i.e., an environmental assessment. What is more, the *Key Tronic* requirement that costs be tied to the "actual cleanup" applied only to legal costs, *id.* at 820, but Gould elides that distinction and attempts to place all attempts at exoneration in the nonrecoverable column. The district court recognized that this was improper, and we affirm.[8]

## D. Apportionment of Liability

The Commission argues on cross-appeal that the district court's division of liability—holding Gould 95 percent responsible and the Commission 5 percent responsible—was an abuse of discretion. *See GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 450 (6th Cir. 2004) ("Abuse-of-discretion review applies to the district court's allocation of [§ 9613(f)] costs."). Because the court made a factual determination that Gould was the "sole cause" of the TCE spill, the Commission argues, *any* apportionment of less than 100 percent of the liability to Gould would be inappropriate. To support this, the Commission points to the purpose behind CERCLA, arguing that the statutory scheme's primary principle is "polluter pays." Gould was the polluter, ergo, Gould pays. But the identity of the initial polluter is not the only consideration—after all, CERCLA concerns "response" to pollution, not just the act of polluting. The district court was entitled to exercise its discretion and find that the Commission's actions made it at least partly responsible for the ultimate size of the costs of cleaning up the TCE. For this and other reasons, the Commission's cross-appeal fails.

---

[8] As a policy matter, a failure to reimburse nonliable (or less-liable) parties for the costs of retaining environmental consultants in CERCLA cases would run the risk of discouraging thorough investigation. A landowner who knows his investigation costs (whether legal or environmental) are nonrecoverable is liable to spend less. But costs saved by private parties are costs incurred by public investigators. To be sure, the Commission "hoped to use" its consultants "as a basis to exonerate itself within litigation." Third Br. for Appellant 11. But in doing so, it prepared third-party scientific reports that proved vital in the district court's ultimate apportionment of liability.

To start with, the text is not as restrictive as the Commission makes it out to be. Section 9613(f), the basis for the Commission's claim here, sets out the criteria for apportioning costs: "[T]he court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f). These factors are not up to each court individually; the general practice now is to use the so-called Gore factors, originally proposed (but never passed) by then-Congressman Al Gore while debating CERCLA.[9] *United States v. Consolidation Coal Co.*, 345 F.3d 409, 413 (6th Cir. 2003) (noting that court "may consider several [Gore] factors, a few factors, or only one . . . depending on the totality of the circumstances" (citation omitted)).

Here, the district court relied on two of the Gore factors when it found the Commission to be 5 percent liable: degree of care exercised and degree of cooperation with officials. Citing the Commission's unreasonable delay in cooperating with the Department, as well as its primary focus on avoiding liability (rather than assisting with the cleanup), the court noted that the Commission had "failed to exercise due care and was recalcitrant." Gould, on the other hand, had "persuasively rebutted [the Commission's] argument that [Gould] unnecessarily delayed its remediation efforts." *Gould Elecs.*, 2020 WL 6793335, at *48. The Commission's shortcomings meant that although Gould had been responsible for the spill, the Commission was "not entirely blameless": its actions

---

[9] The Gore factors are:

(1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
(2) the amount of the hazardous waste involved;
(3) the degree of toxicity of the hazardous waste involved;
(4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
(5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
(6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

*Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 n.4 (6th Cir. 1994).

to "frustrat[e]" the Department's "efforts to determine the source of the TCE plume" were sufficiently reprehensible and damaging that it should bear 5 percent of the liability. *Id.* at \*48–49.

The Commission now argues at length for "fundamental fairness," claiming that CERCLA should have barred the district court from finding Gould anything less than 100 percent liable—but, simultaneously, that CERCLA itself is "nebulous," "bastardized," "gobbledygook," and "puzzlingly unfair." Second Br. for Appellee 34–35, 39, 60–63. It cites little law in support of these propositions. In fact, the Commission's sole legal argument on the Gore factors is one it raised before the district court: that a 1995 EPA policy statement immunizes it from allegations of lack of due care. In that document, the EPA clarified that when it is considering CERCLA enforcement actions against property owners where the contamination is confined to groundwater, it is not a per se "failure of 'due care'" if the owner fails to "conduct[ ] groundwater investigations or install[ ] groundwater remediation systems." EPA, Final Policy Toward Owners of Property Containing Contaminated Aquifers (May 24, 1995), https://www.epa.gov/sites/default/files/2013-09/documents/contamin-aqui-rpt.pdf (last visited Mar. 22, 2022). Therefore, the Commission claims, the owner of a contaminated aquifer who fails to take these steps has always exercised due care. If that sounds strange, it is, primarily because it is illogical: failure to take the steps in the policy guidance is not sufficient to show that an owner *lacked* due care, but that same failure is certainly no proof that the owner *exercised* due care. Add to that the district court's observation that "the policy governs EPA enforcement actions," not "private cost recovery matters," and it is hard to see how the Commission prevails. *Gould Elecs.*, 2020 WL 6793335, at \*34.

A party cannot ignore hazardous waste on its property and refuse to cooperate with regulatory authorities simply because it claims it did not cause the spill. As the Gore factors demonstrate, there are other CERCLA considerations in allocating costs apart from the act of pollution.

What is more, the abuse-of-discretion standard here is "augment[ed]" in favor of the district court by the highly deferential language in § 9613(f), which entitles a court to use its equitable powers when allocating costs. *GenCorp, Inc.*, 390 F.3d at 450. Given that, the lower court's apportionment of liability was within its discretion, and we affirm the denial of the Commission's cross-appeal.

## CONCLUSION

For the reasons above, the judgment of the district court is **AFFIRMED**.